IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| MATTHEW HUTSON,<br>9914 NW Blum Road<br>Parkville, MO 64152 | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | |
| vs. | )<br>) | Case No. 5:19-cv-6020 |
| LIBERTY MUTUAL GROUP, INC.<br>**SERVE REGISTERED AGENT:**<br>    CSC-Lawyers Incorporating Service Co.<br>    221 Bolivar<br>    Jefferson City, Missouri 65101 | )<br>)<br>)<br>)<br>)<br>) | |
| LIBERTY MUTUAL INSURANCE COMPANY<br>**SERVE REGISTERED AGENT:**<br>    CSC-Lawyers Incorporating Service Co.<br>    221 Bolivar<br>    Jefferson City, Missouri 65101 | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff Matthew Hutson (hereafter "Plaintiff" or "Matt"), by and through counsel, and for his causes of action against Defendants LIBERTY MUTUAL GROUP, INC. and LIBERTY MUTUAL INSURANCE COMPANY, states and alleges as follows:

### Parties

1. Plaintiff is an individual residing at 9914 NW Blum Road, Parkville, MO 64152, and he was employed for more than eighteen years by Defendants, including at its Kansas City, Missouri location, until his termination on or about March 22, 2018. Matt is a 61 year old male.

2. Defendant LIBERTY MUTUAL GROUP, INC. is a corporation organized and existing under the laws of the State of Massachusetts, with a principal place of business located

at 175 Berkeley Street, Boston, MA 02116. Defendant LIBERTY MUTUAL GROUP, INC. is registered to do business in Missouri and has the Registered Agent set forth above.

3. Defendant LIBERTY MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Massachusetts, with a principal place of business located at 175 Berkeley Street, Boston, MA 02116. Defendant LIBERTY MUTUAL INSURANCE COMPANY is registered to do business in Missouri and has the Registered Agent set forth above.

## Jurisdiction and Venue

4. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the acts complained of involve violations of Plaintiff's rights under federal law, specifically the Americans with Disabilities Act, As Amended, 42 U.S.C. §12101, et seq., ("ADAAA").

5. Venue is proper within this District pursuant to 28 U.S.C. § 1391 because Defendant has sufficient minimum contacts with this District so as to be considered resident in Missouri for the purposes of the federal venue statute and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the District, including the unlawful employment practices set forth herein that are alleged to have been committed in this District.

## Factual Allegations

6. At the time of his wrongful termination on or about March 22, 2018, Matt was Principal Systems Administrator in Defendants' Kansas City Data Center located in Kansas City, Missouri.

7. Throughout Matt's more than eighteen years of employment with Defendants, he performed all duties of his jobs as required, exceeded the expectations of his positions, and received promotions, raises, bonuses, awards and commendations for his work.

8. At all times herein mentioned, Matt was an "employee" of Defendants within the meaning of the ADAAA and is entitled to all the benefits and protections of those laws.

9. Matt also was subjected to illegal retaliation after he made complaints of illegal harassment and discrimination by Defendants on the basis of his disability.

10. Matt began experiencing health issues in approximately 2010, when he took a short term disability leave for emotional and mental health issues. Matt has struggled with depression and anxiety most of his adult life. Matt worked through his issues and was able to return to work in 2011; his excellent job performance continued. During the period 2011 – 2015, there were no significant job-related issues. Matt did his job and, as a result, continued to receive regular raises and bonuses.

11. In approximately July 2015, Matt suffered another health issue with his back and was off work for about six months recovering from back surgery.

12. Brent Scott first became Matt's supervisor in approximately March 2015, a few months before Matt's back surgery. Mr. Scott had no prior management experience. In addition, his previous work experience was in the data storage group. Consequently, he was not familiar with the work Matt and his colleagues had been doing for the previous 15 years.

13. Before his back surgery, Defendants had planned to put Matt in charge of building all the servers for a new customer – the Latin America Group (LATAM). Since he was going on leave, however, Matt suggested the assignment should be given to a different team member. Justin Riggle and Mr. Riggle handled the assignment during Matt's absence.

14. The LATAM server project was a nightmare from the start. Company guidelines specified that creating a server would take at least 18 business days. LATAM, however, demanded that a server be created within seven business days after an initial request. When a new server was requested, the process involved submission of "change tickets" for creation of firewalls, IP segments, VLAN, and other preparations that were performed by the network support group, a different department. It took up to a week for those change tickets to be approved, then even longer for the work to be done. Until those preparations were completed, it was impossible to create the server. During Matt's absence, even Mr. Riggle and Mr. Scott were not able to satisfy LATAM's unreasonable expectations.

15. When Matt returned from leave in January 2016, the LATAM server project was reassigned to him. He discovered that the project was and had been in turmoil. Mr. Riggle and others explained the problems meeting the customer's expectations. Although the topic was frequently discussed during group meetings and with Mr. Scott, there was no documentation of the ongoing problem. Mr. Scott and fellow employees who had been working on the project told Matt to ignore LATAM's unreasonable expectations and follow Company guidelines. When LATAM complained because servers were not created within seven days, however, Mr. Scott blamed Matt, despite Mr. Scott's directions to the contrary.

16. The LATAM project was reassigned back to Mr. Riggle in mid-2016. Mr. Scott continually criticized and blamed Matt during the approximately six months he worked on that project, even calling him a "failure." Week after week, Mr. Scott unfairly blamed problems on Matt, even though they were beyond Matt's control.

17. During the second half of 2016, Matt was assigned a variety of other tasks, including training employees who were not as experienced as he. Matt's performance on these

4

tasks was satisfactory, and yet Mr. Scott continued to criticize him, claiming Matt was performing only "entry level" work. Of course Matt had no control over the work assigned to him.

18. During 2016, it became the norm for Matt and his colleagues to work from home most of the time. The Company did not allow them to enter the data center until after hours. Consequently, most of their tasks could be completed just as efficiently at home.

19. Mr. Scott's constant criticism eventually took its toll on Matt. He began experiencing depression and anxiety that occasionally interfered with his ability to concentrate.

20. During the second half of 2016, Matt requested a workplace accommodation. He submitted a letter from his psychiatrist explaining the need for accommodation. Human Resources and Mr. Scott, as Matt's supervisor, approved the accommodation, which simply allowed Matt to log off from work, if necessary during the day, to allow him to refocus. He always worked the same number of hours and completed his tasks on time.

21. In 2017, Matt started teaching an employee in India to perform "first builds." The Company was converting physical servers to virtual servers. When a server was requested, Matt would ask the networking group to set up requirements in "the cloud," and otherwise make the necessary preparations for the virtual server. Many times the networking group could not complete its work in a timely manner for a variety of reasons, mainly due to the virtual space not having the same network requirements as the physical space. When that happened, Matt and his Indian colleague were not able to complete the build within 30 days, which was the expectation. Other employees involved in "first builds" experienced the same issues with the networking process. Nonetheless, Mr. Scott never passed up an opportunity to criticize Matt. He was told he had to "deliver on time, regardless of the problems."

22. Defendants had planned to eliminate Matt's role in the first build process when the Indian employee was sufficiently trained. That happened in Mid-2017. Mr. Scott, however, told Matt he was being taken off the project because he failed to deliver on time. Once again, Mr. Scott went out of his way to harass Matt.

23. Mr. Scott's unfair criticism and harassment of Matt reached a new level during his mid-year review on September 12, 2017. The September review was supposed to cover the first half of 2017. Despite that, Mr. Scott reached back to the first half of 2016 for Matt's alleged failures with the LATAM project. Matt protested that he was being blamed for problems outside his control. Mr. Scott didn't care; he seemed determined to push Matt beyond his breaking point.

24. September 12, 2017 was the last day Matt performed any work for the Defendants.

25. The September 12, 2017 review meeting exacerbated Matt's depression and anxiety. Matt had been withstanding a barrage of unfair criticism and blame for more than 18 months. Eventually it wore him down. The next day, September 13, 2017, Matt saw his psychiatrist. The Doctor refused to let Matt go back to work. He submitted the necessary documentation for short term leave, which was approved by Human Resources and Mr. Scott.

26. Approximately one week later, about September 20, 2017, Matt filed a complaint with Human Resources for the withering campaign of harassment and discrimination by Mr. Scott. Matt's complaint was for "ongoing mental health harassment" from his manager.

27. On September 29, 2017, Nathan Dastoli, an employee with Defendants' Human Resources or Employee Relations department sent an email to Matt asking to discuss some of his

6

concerns about his manager, specifically that he had been experiencing "some ongoing mental harassment brought on by your manager."

28. On October 4, 2017, Matt informed Mr. Dastoli that his psychiatrist had placed him on a 30-day leave, that he was admitted into a Partial Hospitalization Psychiatric Program, had been attending group session therapy every day for 4 hours, and had Lithium added to his medications, which also included Cymbalta for depression and Xanax for anxiety.

29. On Friday, October 6, 2017, not having received a response from Mr. Dastoli, Matt sent another email stating that he was expecting to return to work on 10/18/17, provided there was a resolution in place to prevent a relapse.

30. On October 26, 2017, Matt sent an email to Mr. Dastoli asking what he had been able to determine about Matt's reported illegal harassment by Mr. Scott and informed Mr. Dastoli that his return to work has been rescheduled for 11/17/17 because he had been returned to the Partial Hospitalization Program.

31. On November 6, 2017, Matt reminded Mr. Dastoli that a week before he had sent Mr. Dastoli a link to a recording of the discussions between Matt and Mr. Scott, including the one from 9/12/17. Matt informed Mr. Dastoli that it would not be in his best interest to return to work under the same toxic conditions which resulted in him taking the medical leave of absence.

32. Later on November 6, 2017, Mr. Dastoli replied that he expected to conclude the fact finding portion of his investigation by the end of that week.

33. Matt sent an email to Mr. Dastoli on December 4, 2017 asking for an update about the investigation, since he had not heard from Mr. Dastoli since November 6. Matt also informed Mr. Dastoli that three weeks ago it had became necessary to self-admit himself as an inpatient at Signature Behavioral Wellness due to having planned suicidal tendencies. Matt had

remained there for one week while his medications were adjusted and their effects monitored. Matt's new return to work date had been changed to Tuesday, January 2, 2018.

34. Matt and Mr. Dastoli spoke by telephone on December 5, 2017. During that conversation, Mr. Dastoli told Matt that he had talked with Sr. Director William Adams about a transfer to a different job with a different supervisor for Matt and intended to reconnect next week with Mr. Adams and should have a definite answer for Matt about what the work would look like and to whom he would report.

35. On December 22, Matt sent an email to Mr. Dastoli asking for information about job changes and what to expect upon his return to work. Later that day, Mr. Dastoli acknowledged that he had mentioned there was a possibility of some movement of a potential job/manager change for Matt, but he had been waiting to hear back from William Adams. Mr. Dastoli wrote that for the time being, Matt should anticipate returning to his current role reporting to Brent Scott if he was released to return to work on 1/2/18. Mr. Dastoli promised to check in with Mr. Adams and let Matt know if there was anything further on this subject.

36. On December 28, 2017, Matt sent the following message by email to Mr. Dastoli:

As I prepare to visit my doctor later today, there are some things he will be concerned about in determining the safety of my return to a healthy environment. Please understand that this incident with Brent was not isolated to just this time period nor just to me.

What direction has Brent been given and/or what educational sessions has he been required to attend to receive a more thorough understanding for dealing with individuals who have mental challenges?

What continuing education is Liberty Mutual HR requiring of its managers, especially first-time managers, to undergo in an effort to reduce/eliminate the occurrences of these "harassment" conditions of their staff?

What recourse do I have, should these issues arise again, which will not jeopardize my tenure with Liberty Mutual?

8

> Also, as we discussed early in this event, there have been a number of incidents like this with other individuals throughout Liberty Mutual IT infrastructure. Many others are afraid to discuss these issues with management for fear of repercussions, which is why they only talk about it to others with the same issue, hence the continuation of the Culture of Ignorance.
>
> Thank you,
> Matt

37. Once again, Matt was expressing his concern about unfair and illegal retaliation.

38. On February 1, 2018, Matt informed Mr. Dastoli that his return to work date had been rescheduled to March 5, 2018.

39. On February 23, 2018, the Defendants sent Matt a letter asking for information about an alleged application for Long Term Disability benefits. Matt had never applied for LTD benefits.

40. On March 5, 2018, the Defendants notified Matt that he was approved for LTD benefits because he was "disabled" based on his diagnosis of Major Depressive Disorder and Bi-Polar disorder.

41. Matt never wanted to be "disabled." All he ever wanted was to be allowed to do his job without illegal harassment, discrimination, and retaliation.

42. Matt's Short Term disability lasted until mid-March 2018.

43. On March 8, 2018, Mr. Scott called Matt to let him know that he was going to receive a VIP "merit" bonus. In the course of that discussion, Matt informed Mr. Scott that he anticipated returning to work on or about March 12, 2018. Mr. Scott replied: "Good" and asked if Matt needed anything from him. Matt also informed Mr. Scott that Defendants had approved him for Long Term Disability benefits, although, again, Matt stated it was his intention to return to work.

44. Matt received a VIP merit bonus on March 9, 2018.

45. In March 2018, Matt had improved significantly and was ready to return to work. Matt's doctor wrote a letter requesting that Matt be allowed to work part time four hours a day for five days a week so that he could transition back to his job over the upcoming several weeks.

46. A letter from Liberty Mutual Insurance dated April 4, 2018 informed Matt that he was no longer "disabled" because his doctor had written a letter dated March 15, 2018, in which he stated that Matt could return to work without restriction on April 23, 2018.

47. On March 16, 2018, Mr. Scott sent an email to Matt stating:

Hi Matt, My understanding from the conversation with you last week that you are approved for LTD so please remain out and if for some reason the LTD is not approved, we would have no problem accommodating you being out of the office full-time until you are ready to return.

48. On March 22, 2018, Mr. Scott sent a text to Matt stating: "Matt, I understand you have been approved to return partially. Will you be available at 1030 est for a discussion?"

49. Mr. Scott asked Matt to join a skype call later that day to discuss his return. Present on the skype call were Mr. Scott, Mr. Dastoli, and Sr. Director William Adams. Instead of discussing his return, Mr. Scott informed Matt that he was being terminated.

50. Effective March 22, 2018, Matt was terminated from his employment with Defendants for false, pre-textual reasons.

51. The true reasons for the adverse employment actions of Defendants against Matt as set forth herein were illegal disability discrimination, and/or retaliation for his complaints about illegal discrimination and harassment, all in violation of the ADAAA.

52. On July 5, 2018, Plaintiff filed a timely charge of discrimination and retaliation against Defendants with the Equal Employment Opportunity Commission ("EEOC") (copy attached as Exhibit A).

53. On or about November 28, 2018, the EEOC mailed a Notice of Right to Sue to Plaintiff (copy attached as Exhibit B).

54. This case has been filed within 90 days after Plaintiff received the Notice of Right to Sue from the EEOC.

55. Plaintiff has met all deadlines and has satisfied all administrative prerequisites to filing suit.

## COUNT I – DISABILITY DISCRIMINATION (ADAAA)

56. Plaintiff incorporates by reference the allegations of paragraphs 1 through 55 above.

57. The Defendants intentionally discriminated against Plaintiff on the basis of his disability, his record of a disability, or because they regarded him as disabled in the terms and conditions of his employment, including, but not limited to, by refusing to provide reasonable accommodations for his disability, and by terminating his employment for false alleged reasons.

58. At all times relevant to this action, Plaintiff was a qualified individual with a disability within the meaning of that term as utilized in the ADAAA, either as an individual with a physical or mental impairment related to his back injuries and/or emotional and mental health issues, who can perform all of the essential functions of his job with or without accommodation, or because he has a record of such an impairment, or because Defendants regarded him as having such an impairment.

59. The Defendants discriminated against Plaintiff on the basis of his disability by (a) not making reasonable accommodations to the known limitations of an otherwise qualified individual with a disability; (b) denying employment opportunities to and thereafter terminating an employee who is an otherwise qualified individual with a disability; (c) subjecting a qualified

11

individual with a disability to different terms, conditions and privileges of employment than the terms, conditions and privileges available to non-disabled employees; and (d) refusing to accommodate and otherwise interfering with an individual in his exercise of rights under federal law prohibiting discrimination on the basis of a qualified disability, thereby violating the ADAAA.

60. Defendants' termination of Plaintiff was motivated by an actual or perceived impairment related to his back injuries and/or emotional and mental health issues and Plaintiff's physical, emotional, and mental health issues are not both transitory and minor.

61. Plaintiff was able to perform the essential functions of his position either with or without reasonable accommodations at the time he was terminated by Defendants.

62. Defendants' belief regarding Plaintiff's disability was a motivating factor in Defendants' decision to terminate his employment.

63. Defendants were aware of Plaintiff's physical, emotional, and mental health issues.

64. Possible reasonable accommodations for Plaintiff's physical, emotional, and mental health issues include being allowed to return to work part time four hours a day for five days a week for a few weeks so that he could transition back to his full time job and being allowed to log off from work during the day if necessary to re-focus, as Plaintiff had done before his short term disability.

65. Defendants failed to engage in the interactive process and failed to discuss, much less provide any reasonable accommodations to address Plaintiff's disability, as required by the ADAAA.

12

66. As a direct and proximate result of the continuing pattern and practice of discrimination directed toward him or disparate treatment of him and of the Defendants' termination of him, Plaintiff has suffered actual damages in the form of lost wages, lost fringe benefits, loss of earning capacity, loss of career opportunity, costs of seeking alternate income, pain and suffering, future medical expense, mental anguish, emotional distress, loss of enjoyment of life, humiliation, upset and other emotional distress, damage to his reputation, diminished job opportunities, and in other respects, all in an amount yet to be determined.

67. The Defendants' conduct was willful, wanton and malicious, and showed complete indifference to or conscious disregard of the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish the Defendants and to deter the Defendants from like conduct in the future.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants, jointly and severally on Count I, and requests an award of his actual damages, including but not limited to his lost wages and benefits, with interest through the date of trial, damages for emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to reputation, and other nonpecuniary losses, damages for future loss of wages and benefits, punitive damages, all costs including reasonable attorneys' fees, equitable relief as appropriate, including but not limited to reinstatement, and any such other relief as the Court deems just and proper.

## COUNT II – ADAAA RETALIATION

68. Plaintiff incorporates by reference the allegations of paragraphs 1 through 67 above.

69. Plaintiff had a good faith, reasonable belief that the Defendants were engaging in unlawful employment practices that are prohibited under the ADAAA, including harassment

intended to exacerbate Matt's known emotional and mental health conditions. Matt reported his opposition to these unlawful practices to the Defendants and asked for accommodations as set forth herein.

70. The Defendants retaliated against Plaintiff in the terms and conditions of his employment because of his opposition to unlawful employment practices and/or because of his protected actions in requesting reasonable accommodations for a qualified disability, including but not limited to, by refusing to provide reasonable accommodations and by terminating his employment for false alleged reasons.

71. Plaintiff's opposition to the Defendants' unlawful employment practices was a motivating factor in the Defendants' decision to retaliate against him in the terms and conditions of his employment.

72. The Defendants' actions and conduct were outrageous and done with malice, evil motive or with reckless indifference to Plaintiff's rights under the ADAAA.

73. As a direct and proximate result of the Defendants' continuing pattern and practice of illegal retaliation directed toward him or disparate treatment of him and of the Defendants' termination of him, Plaintiff has suffered actual damages in the form of lost wages, lost fringe benefits, loss of earning capacity, loss of career opportunity, costs of seeking alternate income, pain and suffering, future medical expense, mental anguish, emotional distress, loss of enjoyment of life, humiliation, upset and other emotional distress, damage to his reputation, diminished job opportunities, and in other respects, all in an amount yet to be determined.

74. The Defendants failed to make good faith efforts to enforce policies to prevent discrimination and retaliation against their employees, including Plaintiff.

75. The Defendants' retaliatory conduct was willful, wanton and malicious, and showed complete indifference to or conscious disregard of the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish the Defendants and to deter them from like conduct in the future.

WHEREFORE, Plaintiff prays for judgment in his favor and against the Defendants, jointly and severally on Count II, and requests an award of his actual damages, including but not limited to his lost wages and benefits, with interest through the date of trial, damages for emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to reputation, and other nonpecuniary losses, damages for future loss of wages and benefits, punitive damages, all costs including reasonable attorneys' fees, equitable relief as appropriate, including but not limited to reinstatement, and any such other relief as the Court deems just and proper.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Missouri as the trial site for this case.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Aaron C. Johnson
Aaron C. Johnson, MO # 38756
David G. Summers, MO # 42290
Summers & Johnson, P.C.
717 Thomas Street
Weston, Missouri 64098
(816) 640-9940
FAX: (816) 386-9927
aaron@summersandjohnson.com

**ATTORNEYS FOR PLAINTIFF**